**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| CWA/ITU NEGOTIATED PENSION PLAN and ARTHUR DEIANNI, AS TRUSTEE, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. |
| v. | ) ) | |
| CNHI LLC and CUMBERLAND TIMES-NEWS, | ) ) | |
| Defendants. | ) ) ) | |

## COMPLAINT

CWA/ITU Negotiated Pension Plan (the "Plan") and Arthur DeIanni, one of its present trustees, by their undersigned attorneys, Pierson Ferdinand LLP, bring this action against CNHI LLC and Cumberland Times-News (together, "CNHI" or the "Employer") pursuant to Section 4301 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1401(b)(2), 1451, to vacate the Award of Arbitrator Keith D. Greenberg, Esq. (the "Arbitrator"), dated June 2, 2025 and issued June 3, 2025 (the "Award," attached to this Complaint as **Exhibit A**). The Plaintiffs contend that the Award incorrectly found that the Employer did not experience a partial withdrawal pursuant to ERISA § 4205(b)(2)(A)(i).

## NATURE OF THE ACTION

1.     This case involves the assessment of "partial withdrawal liability" under the MPPAA.  Withdrawal liability may arise under MPPAA when an employer either completely or partially ceases to have an obligation to contribute to an underfunded multiemployer pension plan. Withdrawal liability is designed to reflect a withdrawing employer's allocable share of the plan's

unfunded vested benefits.

2.    The Plan determined that CNHI partially withdrew from the Plan upon the retirement of its last remaining employee at the Cumberland Times-News ("Cumberland") on whose behalf contributions were required to be made to the Plan. Because CNHI owns and operates Cumberland—and other newspapers for which CNHI remains obligated to contribute to the Plan—the cessation of CNHI's contribution obligation at Cumberland constituted a partial withdrawal, not a complete withdrawal from the Plan.

3.    At the time the employee retired, he was performing work for Cumberland for which CNHI was required to contribute to the Plan.

4.    After the employee retired, other Cumberland employees continued to perform the same type of work that he had done and for which CNHI had previously been required to contribute to the Plan. Accordingly, the Plan's board of trustees ("Board") imposed a partial withdrawal liability assessment upon CNHI.

5.    CNHI disputed that it had partially withdrawn from the Plan, arguing that it had not continued to perform work of the type for which contributions to the Plan had been required.

6.    The Plan and CNHI agreed upon a stipulation of uncontested material facts and each moved for summary judgment before the Arbitrator specifically with regard to the statutory interpretation of ERISA Section 4205(b)(2)(A)(i), which defines one type of partial withdrawal as follows:

> the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location or to an entity or entities owned or controlled by the employer.

7.    The Arbitrator erred as a matter of law, wrongly concluding that CNHI had not

partially withdrawn because it had not continued to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were required to the Plan.

8.  This Court should vacate the Award and reimpose the Plan's partial withdrawal assessment for CNHI.

## PARTIES

9.  The Plan is a multiemployer pension plan within the meaning of 29 U.S.C. §§ 1002(37) and 1301(a)(3) and was established and maintained for the purpose of providing pension benefits to eligible participants and beneficiaries who have worked in various industries, including the newspaper and commercial printing industries throughout the United States.

10.  Plaintiff Arthur DeIanni is a present trustee and fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A), and he and his fellow trustees, as the Board, constitute the plan sponsor of the Plan within the meaning of 29 U.S.C. § 1301(a)(10).

11.  CNHI is a newspaper publishing company that owns many local newspapers in various states, including Cumberland.

## JURISDICTION AND VENUE

12.  This Court has jurisdiction over this action pursuant to 29 U.S.C. §§ 1401(b)(2) and 1451(c).

13.  Venue lies in this District under 29 U.S.C. §§ 1401(b)(2) and 1451(d) because the Plan is a multiemployer pension plan and the Plan is administered at 27 Roland Avenue, Suite 200 Mount Laurel, New Jersey 08054-1057.

## ALLEGATIONS

14.  Cumberland had been party to successive collective bargaining agreements with Pittsburgh Typographical Union No. 7/CWA 14827 (the "Union"), including the most recent

collective bargaining agreement between Cumberland and the Union (the "CBA").

15.    The CBA describes its jurisdiction, pursuant to which Cumberland was obligated to contribute to the Plan on behalf of employees covered by that agreement ("covered employees").

16.    Like Cumberland, other newspapers wholly owned by CNHI are parties to collective bargaining agreements with various local unions of the Communications Workers of America which obligate them to contribute to the Plan pursuant to the terms of such agreements.

17.    The jurisdiction of the CBA includes work that covered employees performed outside of what is referred to as the composing room.  Historically, the composing room was the place where news stories, received in typewritten form from the editorial room and other news departments, were set in type for printing of the newspaper.

18.    Cumberland's last covered employee, Charles Sine, retired on November 30, 2022.

19.    Although Sine had once worked in the composing room, he was performing work outside the composing room pursuant to the terms of the CBA at the time of his retirement.

20.    Cumberland was required to make contributions to the Plan for the work that Sine performed outside the composing room.

21.    At the time of Sine's retirement, Cumberland ceased to have an obligation to contribute to the Plan under the CBA but continued to have an obligation to contribute to the Plan under collective bargaining agreements covering other employees at newspapers owned by CNHI.

22.    Based upon information provided by CHNI in response to a request for information made by the Plan, the Board determined, as a factual matter, that—after Sine retired—other Cumberland employees continued to perform the same type of work that he had done and for which CNHI had been previously required to contribute to the Plan.

23.    By letter dated April 17, 2024, the Plan issued a partial withdrawal liability

assessment (the "Assessment"), determining that CNHI had partially withdrawn within the meaning of § 4205(b)(2) of ERISA in the plan year ending December 31, 2022, and demanded payments be made in accordance with the schedule set forth therein.

24.     By letter dated May 7, 2024, CNHI filed a request for review with respect to the Plan's Assessment asking the Plan to review the determination that CNHI had partially withdrawn.

25.     By letter dated July 5, 2024, the Plan responded to the request for review and rejected CNHI's arguments.

26.     By letter dated July 17, 2024, CNHI demanded arbitration, as required under § 4219 of ERISA, disputing the Plan's determination that CNHI had partially withdrawn.

27.     After engaging in discovery and reaching agreement on a stipulation of uncontested material facts, the parties thereafter each moved for summary judgment as a matter of law.

28.     On June 2, 2025, the Arbitrator issued the Award, interpreting § 4205(b)(2) and wrongly concluding that a partial withdrawal had not occurred.

29.     In issuing the Award, the Arbitrator's conclusions of law were in error.

30.     The American Arbitration Association served the parties with the Award on June 3, 2025.

31.     Through this action, Plaintiffs seek to timely vacate the Award's finding that CNHI had not partially withdrawn from the Plan.

## COUNT I: VACATUR OF ARBITRATION AWARD

32.     Plaintiffs repeat and reallege the preceding paragraphs as though fully set forth herein.

33.     Plaintiffs file this Complaint to vacate the Award after having fully exhausted the statutory alternative dispute resolution procedures required in ERISA. The Arbitrator wrongly

determined that CNHI had not partially withdrawn from the Plan under § 4205(b)(2).

34.    Accordingly, the Award must be vacated.


WHEREFORE, Plaintiffs request the Court to enter judgment in their favor against the Defendants and request the following relief:

(a) Vacating the Arbitrator's Award and its determination that CNHI did not partially withdrew from the Plan;

(b) Reimposing the Plan's partial withdrawal assessment; and

(c) An award of attorneys' fees and costs.


Dated: July 1, 2025
    Philadelphia, Pennsylvania

                                          Respectfully submitted,

                                          PIERSON FERDINAND LLP

                                          */s/ Eric Meyer*
                                          Eric Meyer
                                          Marc A. Lindemann (*pro hac vice* to be filed)
                                          1650 Market Street, Suite 3600
                                          Philadelphia, PA 19103
                                          Tel: 267.225.4813
                                          eric.meyer@pierferd.com

                                          *Counsel for Plaintiffs*

# **EXHIBIT A**

In the Matter of Arbitration:

CNHI, LLC; CUMBERLAND TIMES-NEWS    |

                                      |  AAA Case No. 01-24-0006-5225

        and                            |

                                        |  Ruling on Cross-Motions

CWA/ITU NEGOTIATED PENSION PLAN    |  for Summary Judgment

BEFORE: Keith D. Greenberg, Esq., Impartial Arbitrator

APPEARANCES:

      For the Employer:

             Michael G. McNally, Esq.
             (Fox Rothschild LLP)

      For the Plan:

             Kyle Flaherty, Esq.
             (Pierson Ferdinand LLP)

# <u>BACKGROUND</u>

This matter arises on cross-motions for summary judgment filed by CNHI, LLC (the "Employer") and the Plan in connection with this arbitration proceeding in which the Employer has challenged the Plan's April 17, 2024 Demand for payment of withdrawal liability by the Employer based on the Plan's assessment that the Employer had experienced a partial withdrawal from the Plan. The Parties each submitted opening and responsive briefs; all of these, as well as the attachments and exhibits thereto, have been reviewed and considered in their entirety.

This matter concerns a subsidiary of the Employer, the Cumberland News-Times ("Cumberland" or the "Newspaper"), which forms part of the Employer's controlled group. The Parties entered into a Stipulation of Uncontested Material Facts, which provides in relevant part that:

**<u>The Parties</u>**

    1.   CNHI is a limited liability company with a principal place of business in Montgomery, Alabama. CNHI is a newspaper publishing company that owns many local newspapers in various states.

2.    Cumberland is a daily newspaper which has existed since the early 19th century under various names.  It serves Cumberland, Maryland, and the surrounding areas of Allegany and Garrett counties in Maryland, and Mineral, Hampshire and Hardy counties in West Virginia.

3.    CNHI is the owner of Cumberland, and the individuals who work at Cumberland are CNHI employees.

4.    The Plan was created in 1966 by the International Typographical Union ("ITU") and various employers in the newspaper and commercial printing industries in the United States.

5.    The Plan is a multiemployer pension plan established and maintained for the purpose of providing pension benefits to eligible participants and beneficiaries who have worked in various industries, including the newspaper and commercial printing industries throughout the United States.

6.    Since 2010, the Plan has been certified as a "critical" status and/or "critical and declining" status multiemployer pension plan as defined by the Pension Protection Act of 2006.

**Obligation to Contribute to the Plan**

Cumberland

7.    Cumberland has been party to successive collective bargaining agreements with Pittsburgh Typographical Union No. 7/CWA 14827 ("Union").[1]

8.    The most recent collective bargaining agreement between Cumberland and the Union covered the period November 1, 2017, through October 31, 2022 ("CBA").  ***A copy of the CBA is attached as Joint Exhibit A.***

9.    In accordance with Article XV of the CBA, Cumberland was obligated to contribute to the Plan on behalf of each employee covered by that agreement.

Other Newspapers

10.    Like Cumberland, other newspapers wholly-owned by CNHI, including The Tribune-Democrat, The New Castle News, The Eagle-Tribune, The Enid News & Eagle and The Tribune Star (together with Cumberland, the "CNHI Controlled Group"), are parties to collective bargaining agreements with various local unions of the CWA which obligate them to contribute to the Plan pursuant to the terms of such agreements.

**Collective Bargaining Agreement Between Cumberland and the Union**

Recognition

11.    The jurisdiction of the Union is described in Article V of the CBA.

Composing Room

12.    Historically, the composing room was the place where news stories, received in typewritten form from the editorial room and other news departments, were set in type for printing of the newspaper.

13.    Setting of newspaper type in the composing room was originally done by hand until the 1880s when the Lintoype machine was introduced.  The Linotype machine became one of the main methods for typesetting.  It was a faster production method and required fewer people than typesetting by hand.

14.    Subsequently, the Lintoype was replaced by a process called photosetting, also referred to as "cold type."

15.    In the newspaper industry the developing technologies that would replace Linotype machines and photosetting was referred to as "automation."  Automation greatly reduced the need for skilled craftsmen, and the ITU opposed it.

Lifetime Job Guarantee Agreement

16.  To address the impact of new technology on the job security of bargaining unit members, in 1976 Cumberland and the Union negotiated a lifetime job guarantee agreement ("LJG") for composing room employees.

17.  The terms of the LJG are described in Article XVIII of the CBA.

Automation of the LJG

18.  In Article V, Sections 1 through 4 of the CBA, Cumberland and the Union agreed to various terms concerning automation and the introduction of new technology that would, over time, eliminate tasks and functions that had been performed mechanically and/or manually in the composing room and in other departments of Cumberland.

**Cessation of Operations in Cumberland's Composing Room**

19.  Over time and through automation, tasks and functions that had traditionally been performed by Cumberland in the composing room had evolved through Cumberland's introduction and implementation of new methods, equipment, systems and processes to the point that traditional composing room work had ceased.

20.  The composing room employees on whose behalf Cumberland was obligated to contribute to the Plan were subject to the LJG.  While these employees remained employed, Cumberland assigned them to perform various other tasks consistent with the terms of Article V of the CBA and made contributions to the Plan on their behalf.

21.  When the CBA became effective on November 1, 2017, there were two (2) remaining employees subject to the LJG: Frank Goebel and Charles Sine.

**Assignment of Work to Goebel and Sine**

22.  Pursuant to the terms of Article V of the CBA, Cumberland continued to assign Goebel and Sine various assignments.

23.  Goebel retired from Cumberland on December 31, 2019, leaving Sine as the last Cumberland employee subject to the LJG.

24.  In the period beginning in or around October 2020 through and until November 2022, Cumberland assigned Sine various assignments, including data entry, saving e-mailed files from advertisers, and manual filing of tear sheets.  In addition, Sine saved camera ready files received from advertisers into the system for the Graphics Department to lay out.  Cumberland remained obligated to make contributions to the Plan on behalf of Sine under Article XV of the CBA.

25.  Sine retired on November 30, 2022, at which time Cumberland ceased to have an obligation to contribute to the Plan under the CBA but continued to have an obligation to contribute to the Plan under collective bargaining agreements covering other employers within the CNHI Controlled Group.

**Following Sine's Retirement**

26.  Following Sine's retirement, Cumberland assigned other non-union employees assignments that previously had been assigned to Sine.  Cumberland had no obligation to make any contributions to the Plan on behalf of any other Cumberland employee.

**Partial Withdrawal Liability Assessment**

27.  By letter dated April 10, 2023, from Plan counsel to Claimant's counsel, the Plan requested certain information from CNHI and Cumberland in accordance with ERISA Section 4219(a)(1).  *A copy of the April 10, 2023, letter is attached as Joint Exhibit B.*

28.  By letter dated May 4, 2023, from CNHI's counsel to Plan counsel, CNHI provided information responsive to the Plan's April 10, 2023, letter.  *A copy of the May 4, 2023, letter is attached as Joint Exhibit C.*

29.  After considering the information provided by CNHI in May 2023, by letter dated April 17, 2024, the Plan issued a partial withdrawal liability assessment ("Assessment") against CHI in connection with a partial withdrawal that occurred in 2022 when Cumberland ceased to have an obligation to contribute to the Plan following Sine's retirement.  In issuing the Assessment, the Board of Trustees of the Plan determined that the CNHI Controlled Group effected a partial withdrawal from the Plan within the meaning of § 4205(b)(2) of MPPAA, 29 U.S.C. § 1385(b)(2), in the plan year ending December 31, 2022.  *A copy of the Assessment is attached as Joint Exhibit D.*

30.  Under the Assessment, CNHI is required to make eighty (80) quarter-annual installments of $21,519 beginning June 1, 2024.

31.  By letter dated May 7, 2024, CNHI filed a request for review ("Request for Review") with respect to the Assessment.  *A copy of the Request for Review is attached as Joint Exhibit E.*

32.  By letter dated July 5, 2024, the Plan responded to the Request for Review informing CNHI that the Board of Trustees of the Plan had considered all of the issues raised by CNHI and had determined that there is no basis to withdraw or modify the Assessment in any respect.  *A copy of the July 5, 2024, response to the Request for Review is attached as Joint Exhibit F.*

FN1 – In 1987 the ITU merged into the Communication Workers of America ("CWA"), and Pittsburgh Typographical Union No. 7 became Pittsburgh Typographical Union No. 7 / CWA 14827.

(Spelling and emphasis as in original.)

Additional Evidence Adduced in Connection with the Cross-Motions

Although the following evidence was not shown to be jointly agreed-upon, the evidence was provided to the Undersigned as part of a jointly-sent transmission of materials for this matter to be decided on written submissions.

The record reflects that the Employer submitted an affidavit from Jeremy Warnick, the Newspaper's Graphics Supervisor, who was responsible for assigning work to Mr. Sine following the Newspaper's cessation of composing room work.  Mr. Warnick's affidavit provided in relevant part that:

1.  I am employed by CNHI, LLC at the Cumberland Times-News as the Graphics Supervisor.  I have worked in this position for 17 years and have been with the Cumberland Times-News since October 2001.

2.  In my current role I am responsible for designing and organizing advertisements and some special sections as well as providing marketing materials to advertising.

3.  I became Charles Sine's supervisor as of January 1, 2014.  Through that I have personal knowledge of some of the work he did.

4.  My understanding is that although Sine was a compositor, because he had a lifetime job guarantee the newspaper was required to keep him employed.  In order to make him a productive employee I was responsible for assigning him tasks that he had the skills to complete or training him to complete tasks I assigned.

5.  A task that he was assigned before I became his supervisor, was daily filing of print versions of the newspaper for archival purposes.  He was asked to maintain a filing room that contained copies of the newspaper.  This work was also performed by members of the Circulation Department.  We still maintain print versions of the newspaper, and the filing of those is performed by members of the Circulation Department.

6.  Before I became his supervisor, Sine was assigned to manually file tear sheets and send them to advertisers.  A tear sheet is an advertisement that is cut or torn from the newspaper and sent to an advertiser to prove that their advertisement was included in the publication.  Advertising

assistants also performed these same tasks alongside Sine.  Currently the advertising staff saves tear sheets digitally and sends them to advertisers by e-mail unless a physical copy is asked for.

7.   Sine was also assigned to assist with print ready advertisements provided by advertising and ad building.  On the print ready ads, he was taught to process them and save them to the proper folder.  This was also done by myself and other members of my Department.  I and other members of my Department now receive and save these print ready advertisements to the computer system as needed.  Ad building is done on computers using software programs.  A program we previously used and that Chuck worked on was called Multi-Ad Creator.  Members of the Graphics Department would perform typesetting, gather images and organize all the items needed to build the ad into a digital folder.  Chuck and other members of the Union would then use Multi-Ad to build the ad.  To the best of my recollection, in or around 2011 the Multi-Ad software developer stopped providing updates and supporting the program.  We continued to use it but over time we transitioned to Adobe InDesign, which had more creative tools and better processing abilities.  Chuck was provided training on InDesign, but he did not become proficient at it.  Today, there are less advertisements we publish, of which many are print ready.  For advertisements we build, Advertising Assistants provide me with the raw art and a text file and I use InDesign to build the ads.

8.   I was also Justin Barnhart's supervisor.  Justin began working at the paper in or around December 2022 as a graphic artist.

9.   He was primarily responsible for producing Allegany Magazine, which is a monthly publication and a sister to the Cumberland-Times News.  It is a glossy magazine that uses the byline "The Area's Premier Lifestyles Magazine."  He organized the layout of the magazine as well as formatting the graphics used in it.

10.  Barnhart was also responsible for layout of advertisements in the newspaper's print and digital versions, and assisted with special projects that required his expertise.

11.  Barnhart was hired following Sine's retirement because there was room in the budget at that time.  He was not hired to replace Sine, nor did he perform tasks that Sine had been assigned.  Barnhart was hired as a skilled graphics artist with extensive experience on the software programs we use.  Sine was not a graphic artist.

(Spelling as in original.)

The Plan submitted an affidavit from Arthur DeIanni, the Union's President from 2003 through 2023; his affidavit provided in relevant part that:

2.   For many years, the Union had served as the exclusive bargaining representative of the composing room employees employed by CNHI, LLC d/b/a Cumberland Times-News ("Cumberland"), and had been party to collective bargaining agreements with Cumberland, including the parties' most recent collective bargaining agreement for the period November 1, 2017 through October 31, 2022 ("CBA").

3.   The Union no longer represents any employees employed by Cumberland.

4.   During the parties' bargaining relationship, Cumberland and the Union had agreed to various terms concerning automation and the introduction of new technology that would, over time, eliminate tasks and functions that had been performed mechanically and/or manually in the composing room.

5.   CBA Article V, Sections 1 through 3 established that the Union's traditional composing room jurisdiction would become non-exclusive as Cumberland introduced new methods, equipment, systems, and processes that would eliminate traditional composing room work.

6.   These sections of Article V conveyed the reality that traditional composing room work would evolve through advancements in technology and that Cumberland would need the flexibility to implement those technological advancements in its production departments.

7.   As an inducement for the Union to relinquish its exclusive jurisdiction under Article V of the CBA and to agree that Cumberland could utilize composing room employees to perform work that had evolved through automation, regardless of whether such work was considered

traditional composing room work, Cumberland agreed to provide lifetime job guarantees for the composing room employees.

8. Cumberland benefited from this exchange because the newspaper secured the exclusive rights, within management's sole discretion, to develop and implement automation and new technologies through the deployment of union and non-union personnel to perform tasks and functions without regard to whether such tasks and functions had evolved from similar work that had been within the traditional jurisdiction of the CBA.  The Union benefited from this exchange because it had been able to secure lifetime job protections for their represented group.

9. For many years and continuing until the bargaining relationship ended in November 2022, Cumberland exercised its rights under Article V of the CBA and regularly assigned bargaining unit employees, including Frank Goebel and Charles Sine, to perform tasks and functions that were beyond the traditional jurisdiction of the CBA, including daily assignments in Cumberland's Graphics Department.

The Plan also adduced an affidavit from Donald McConnell, Chairman of the Plan's Board of Trustees, who described the correspondence sent by the Trustees to the Employer and received by the Trustees from the Employer in connection with this dispute, as well as a brief description of the relevant determinations made by the Trustees in connection therewith.

Relevant Statutory Provisions

Section 1385, Partial withdrawals, of Title 29 of the United States Code ("ERISA § 4205") states in relevant part that:

(2)

(A) There is a partial cessation of the employer's contribution obligation for the plan year if, during such year—

(i) the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location or to an entity or entities owned or controlled by the employer . . . .

Section 1401, Resolution of disputes, of Title 29 of the United States Code ("ERISA § 4221") states in relevant part that:

(a) Arbitration proceedings; matters subject to arbitration, procedures applicable, etc.

. . . .

(3)

(A) For purposes of any proceeding under this section, any determination made by a plan sponsor under sections 1381 through 1399 of this title and section 1405 of this title is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous. . . .

<u>Relevant Provisions of the Collective Bargaining Agreement between the Newspaper and the Union</u>

Article V, <u>Introduction of New Equipment And Processes</u>, of the November 1, 2017 through October 31, 2022 collective bargaining agreement (the "CBA") between the Newspaper and the Union states in relevant part that:

Section 1.  The Employer has introduced and, in the future, shall continue to introduce new methods, equipment systems and processes into various departments of its newspaper which will eliminate tasks and functions presently performed mechanically and/or manually in the composing room and in other departments of the newspaper.  It is understood that the continued introduction of additional new methods, equipment, systems and processes as well as the increasing ability of advertisers, agencies and independent contractors to supply editorial and advertising matter in a form that can be processed and used in the newspaper with little or no additional work being performed on it will have an impact on employment opportunities in a number of departments, including the composing room, of the newspaper.

Section 2.  The purpose of this Article is as follows:
    (a)  To recognize the Employer has the right to fully, comprehensively and efficiently use the new methods, equipment, systems and processes that have been and will be introduced into the various departments of the newspaper including the composing room.

    (b)  To identify work to be performed by composing room employees and other employees as the changeover to new production methods, equipment, systems and processes leading to pagination continues to take place.

Section 3.  The jurisdiction of the Union for purposes of collective bargaining is defined as all work now being performed in the composing room of the Publisher by employees represented by the Union so long as such work is to be performed or until new technology, new equipment or new processes that is being or will be introduced into the various departments of the newspaper affect such work.  It is recognized that the Publisher has the right to assign any of the work to be done by or on such new technology, equipment or processes to any department of the Publisher including departments not covered by this Agreement.  The Union agrees to process copy of matter of any kind or nature produced in such other departments.  The Publisher has the sole right to determine what constitutes new technology, equipment or processes.  Subject to the right of the Publisher to assign, at any time during the term of this Agreement as the changeover to new technology, new equipment or new processes takes place, any work to be done by or on such new technology, equipment or processes to departments not covered by this Agreement, the jurisdiction of the Union shall be such work as is now being performed in the composing room for so long as the Publisher determines such work shall continue to be performed by employees covered by this Agreement, such manual paste-makeup as is presently being done by employees covered by this Agreement, to the extent it continues and such other work which may be temporarily or permanently assigned to the composing room by the Publisher to be performed by employees covered by this Agreement.  It is recognized that the technology, new equipment and new processes over time will materially decrease the manual paste-makeup of advertisements and full or partial pages as is currently being done in the composing room but to the extent such manual paste-makeup as is currently being done in the composing room continues to be performed, it will be performed by employees covered by this Agreement.

Section 4.
(a)  If the Employer assigns unit employees to perform work outside the composing room, such assignments shall be limited to work requiring compatible skill, aptitude or ability similar to that traditionally performed by bargaining unit employees.

(b)   The parties agree that the following assignments are illustrative of the type which may properly be made by the Employer pursuant to paragraph (a) above.
(1)   Advertising Customer Service
(2)   Customer Service Department
(3)   Computer Technicians/Operators, including computer-to-plate equipment
(4)   Pagination Functions
(5)   Data Entry
(6)   Layout

It is further agreed, however, that the Employer may not make any assignment if it would require the employee to drop membership in the Union or require the employee to become a member of another labor organization.

(c)   In the event that the Employer eliminates the composing room functions or moves the worked performed in the composing room to another location, the Employer agrees to provide retraining to any employee included on the Job Security Roster as part of the re-assignment of such employee to another position.

(d)   Employees assigned to work outside the composing room will retain their priority in the composing room, remain covered by the contract (and represented by the Union) except as to the work performed, breaks, vacation schedules, holiday schedules, and shall follow the instructions of the supervisors) where they are assigned.  Hours shall be scheduled by the Employer in the normal manner of the department (or sub-department) to which the employee is assigned, and Company seniority by classification will be recognized.  In vacation selection, Company seniority by classification of employees so assigned will also be recognized.  Any employee may be subject to temporary assignment to work outside the composing room including a partial work day. Positions available for transfer other than temporary assignments shall be posted.  The posting shall include the Department, Hours, Days Off, and Duties of the Assignment.  Employees assigned by the Employer to work outside the composing room other than temporary assignment who have not signed a posting shall be assigned in the reverse order of priority, based upon the ability and qualification of the employee to perform the available work.

(e)   Employees will not be disciplined because they cannot satisfactorily perform such new work provided that employees are obliged to make a good faith effort to satisfactorily perform any work they are assigned.  There shall be a thirty (30) day trial period which may be extended by the Employer for up to an additional thirty (30) days, after which an employee may be assigned to another position if the employee cannot satisfactorily perform the work.  In the event that the Employer posts a vacant full time situation in the composing room, employees who have been transferred to other departments may claim such a situation on a priority basis.

(f)   In the event of an express or implied conflict between the provisions of this Article and any other provisions of the parties' collective bargaining agreement, this section shall apply.

(g)   The Union shall not gain jurisdiction in other departments of the Employer solely as a result of the operation of Sections (3) and (4) hereof nor shall any transfers herein be deemed to cause an accretion to the collective bargaining unit.

## Article XV, Pension, of the CBA states in relevant part that:

The Employer agrees to contribute to the ITU Negotiated Pension Plan (hereinafter sometimes referred to as the plan) $79.00 per week ($15.80 per shift) for each employee covered by this Agreement for the purpose of providing pensions on retirement, death benefits, and other related benefits for covered employees of the Employer and other contributing Employers.  Contributions shall be made for any shift for which an employee receives compensation (e.g., sick leave, vacations, holidays, disability insurance, bereavement leave, jury duty).  The Plan is jointly administered by Trustees appointed in equal numbers by the Union and Employers under an

Case 1:25-cv-12582-ESK-MJS    Document 1    Filed 07/01/25    Page 16 of 31 PageID: 16

CNHI, LLC; Cumberland Times-News and CWA/ITU Negotiated Pension Plan          Page 9 of 24
(AAA Case No. 01-24-0006-5225) (Ruling on Cross-Motions for Summary Judgment)

Agreement and declaration of Trust, and has been found by Internal Revenue Service to be entitled to exemption under the Internal Revenue Code.

Article XVIII, Job Security Roster, of the CBA states in relevant part that:

The Employer agrees that the employees whose names appear in the job security roster below, will be retained on situations for the remainder of their working lives unless vacating same through retirement, resignation, permanent disability, death or discharge for cause; provided, however, in the event of permanent suspension of the Employer's operation, such employment guarantee will thereupon cease, and provided further, in the case of a strike, lockout, Act of God, or other situation over which the Employer has no control, which results in a period of temporary suspension of the Employer's operations, the job guarantee will be suspended for such period of temporary suspension of operation only.

Job Security Roster<br>Goebel, Frank<br>Sine, Charles

The terms of this Article shall continue in force through succeeding agreements unless changed by mutual agreement between the parties.

## CONTENTIONS OF THE EMPLOYER

The Employer did not experience a partial withdrawal, as defined in ERISA § 4205(b)(2)(A)(i), from the Plan during the plan year ending December 31, 2022. The Employer is, therefore, entitled to summary judgment. There are no facts to support the Plan's claim that the Employer continued to perform work for which contributions were required under the terms of the CBA. The only work for which contributions were required pursuant to the terms of the CBA was work in the Newspaper's composing room, which ceased years ago. The Plan erroneously asserts that the LJG applicable to bargaining unit employees created an obligation on the part of the Employer to contribute to the Plan on behalf of non-bargaining unit employees working in other departments. Rather, the Employer's obligation to contribute to the Plan on behalf of bargaining unit employees arose on behalf of the bargaining unit employees themselves pursuant to the LJG, and not as a function of the work that those employees were performing. Because the Plan's position is fundamentally flawed and unsupported by law or by the undisputed factual record here, the Arbitrator should find that the Employer was not required to contribute to the Plan for non-bargaining unit work performed by non-bargaining unit employees outside of the composing room, and should find, therefore, that the Employer did not experience a partial withdrawal from the Plan within the meaning of ERISA § 4205(b)(2)(A)(i).

Consistent with the holding in *Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 113 S. Ct. 2264 (1993), it is well settled that in arbitrations under MPPAA, the

factual determinations made by plan trustees are presumed correct, and that an employer bears the burden of disproving those determinations by a preponderance of the evidence. The Trustees' determinations of law, however, enjoy no presumption of correctness, and such determinations should be reviewed *de novo*. The issue presented here is a question of law rather than one of fact. The Parties do not dispute that the Employer ceased to perform work in the Newspaper's composing room and that there were no longer any bargaining unit employees subject to the LJG employed by the Employer after November 30, 2022. The Trustees' determination here rests on the assertion that work performed outside of the Union's work jurisdiction – in departments other than the composing room and for which the Employer had never had an obligation to contribute to the Plan – was work for which contributions to the Plan were required. This is a determination of law rather than one of fact; it requires a legal interpretation of the terms of the CBA, consideration of the Parties' past practice, and a comprehensive understanding of applicable law. It should be subject to *de novo* review by the Arbitrator here without any presumption of correctness.

Even if, however, the Arbitrator were to agree with the Plan that the Trustees' determination here was a purely factual one entitled to a presumption of correctness, the Employer has shown by preponderance of the record evidence that the Trustees' determination was incorrect. Section 4205(b)(2)(A)(i) of ERISA makes clear that:

> There is a partial cessation of the employer's contribution obligation for the plan year if, during such year—
>> (i) the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location or to an entity or entities owned or controlled by the employer . . . .

In PBGC Opinion Letter 83-20, the Office of the General Counsel ("OGC") of the Pension Benefit Guaranty Corporation ("PBGC") opined that, for a partial withdrawal to occur pursuant to ERISA § 4205(b)(2)(A)(i), the work that the employer continues to perform must be work for which contributions are not required under the Plan – that is, "where an employer's collective bargaining obligation has ceased altogether but the employer continues to perform work of the same type which was previously covered under the agreement, and for which contributions were required without the obligation to contribute to the plan. . . ." In PBGC Opinion Letter 86-21, the PBGC OGC subsequently opined that a plan must demonstrate that

there was a continuation of the same work covered under the CBA for which contributions were previously required in order to support a finding of a partial withdrawal under ERISA § 4205(b)(2)(A)(i).

The dispute here presents an issue of first impression in the context of a lifetime job guarantee of the sort included in the relevant CBA here. The limited caselaw addressing ERISA § 4205(b)(2)(A)(i), however, does support the Employer's position in this case. In *Caesars Entm't Corp. v. IUOE Local 68 Pension Fund*, No. 2:17-cv-2450-KM-MAH, 2018 U.S. Dist. LEXIS 100734 (D.N.J. June 14, 2018), the controlled group operated four casinos and was obligated to contribute to the fund for engineering work performed at all four of those locations, each in Atlantic City, New Jersey. After one of the four casinos closed – such that contributions ceased for work at that casino – but the other three casinos remained open, the employer continued to remit contributions for the work that continues to be performed at the remaining three relocations. Both the District Court and the Court of Appeals for the Third Circuit determined that there was no partial withdrawal under ERISA § 4205(b)(2)(A)(i) because no work of the type for which contributions were previously required continued at the closed casino. *Id.*, 2018 U.S. Dist. LEXIS 100734, at *19-24; *Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund*, 932 F.3d 91 (3d Cir. 2019). Similarly here, CHNI has an obligation to continue to contribute to the Plan for other newspaper operations apart from Cumberland. However, work performed at Cumberland for which the Employer was required to contribute to the Plan has permanently ceased, because no composing room work continues at Cumberland and, therefore, no partial withdrawal occurred.

The Arbitrator should also look to precedent interpreting the building and construction industry exemption found at ERISA § 4203(b), where the dispositive issue is whether an employer continued to perform work in the jurisdiction of the collective bargaining of the type for which contributions were previously required – in other words, whether work for which contributions were previously required has continued. The statutory language of the building and construction industry exemption is virtually identical to that found at ERISA § 4205(b)(2)(A)(i). Particularly given the scarcity of case law applying Section 4205(b)(2)(A)(i) in the context of a lifetime job guarantee, cases applying the building and construction industry exemption should be viewed as persuasive and instructive in resolving the dispute here. *See, e.g.*, *Whiting-Turner Constr. Co. and Laborers Dist. Council Pension and Disability Tr. Fund*

*No. 2*, AAA Case No. 01-18-003-5360 (Arbitrator Ira F. Jaffe, Esq.) (July 10, 2023) (finding, under application of building and construction industry exemption, that employer's assignment of work previously performed by laborers under collective bargaining agreement to outside contractors after termination of collective bargaining agreement was not work for which contributions would have been required under the terminated collective bargaining agreement); *Laborers' Pension Fund v. W.R. Weis Co.*, 879 F.3d 760, 766-68 (7th Cir. 2018) (finding, under building and construction industry exemption – where employer had employed laborers, bricklayers, marble setters, and finishers but subsequently terminated its collective bargaining agreement covering laborers – that there was no withdrawal where the employer continued to perform work previously performed by laborers with bricklayers, marble setters, and finishers who were all covered by another collective bargaining agreement and for whom the employer made contributions to a different fund, because the employer had not been previously required to make contributions to the Laborers' Pension Fund for any work performed by those non-laborer categories of employees).

In all of these cases, as the Arbitrator should find here as well, the relevant inquiry concerned whether the employer continued to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required.  Here, the work for which the Employer was obligated to contribute was work in the composing room. Once work in the composing room ceased, there was no longer work for which contributions would have been required under the CBA.  Although the Employer remained obligated to contribute on behalf of the employees covered by the LJG, that obligation arose out of the obligation to continue to employ those employees covered by the guarantee rather than arising out of the specific work that they were assigned to perform.  In sum, once the last of those covered employees – Mr. Sine – was no longer employed, the Employer did not continue to perform work for which contributions were required under the CBA.

In construing the relevant CBA, the Arbitrator should reach the only rational interpretation of the relevant language – that is, that contributions to the Plan were required on behalf of bargaining unit employees working in the composing room but that, after the closure of the composing room, the obligation to contribute was only on behalf of those bargaining unit employees subject to the LJG.  The CBA specifically obligates the Employer to contribute to the

Plan for each employee covered by the CBA.  The CBA goes on to define the jurisdiction of the

Union for purposes of collective bargaining as:

> all work now being performed in the composing room of the Publisher by employees represented
> by the Union so long as such work is to be performed or until new technology, new equipment or
> new processes that is being or will be introduced into the various departments of the newspaper
> affect such work.  It is recognized that the Publisher has the right to assign any of the work to be
> done by or on such new technology, equipment or processes to any department of the Publisher
> including departments not covered by this Agreement.

In particular, the CBA specified the particular employees – including Mr. Sine – who

were protected by the LJG until their respective retirements.  Nothing in the LJG provisions of

the CBA reflected a transfer of bargaining unit work to other departments of the Newspaper.

Rather, the LJG provisions addressed the Parties' bargain – that, in exchange for the Employer's

right to totally eliminate bargaining unit work, the Employer provided the employees who would

be affected by such elimination with a lifetime job guarantee.  The CBA also provided the

Employer with the flexibility to assign tasks outside of the jurisdiction of the Union to the

protected employees so that they would not sit idle and/or unproductive during their period of

guaranteed employment.  In particular, Mr. Sine was assigned duties in other departments of the

Newspaper after the Newspaper had ceased to perform any composing room work.  Mr. Sine's

assigned work in those other departments was also performed by other members of those

respective departments, and following Mr. Sine's retirement, those duties continue to be

performed by the employees of those departments who are outside of the jurisdiction of the

Union as defined in the CBA.  Notably, there is no claim here by the Plan that the Employer has

continued to perform composing room work.  Rather, the Plan attempts to argue that, when the

Employer assigned employees with the LJG to perform non-bargaining unit work in departments

outside of the composing room, the jurisdiction of the Union was expanded to include that other

work.  The Plan is simply wrong.  Mr. Sine performed work outside of the composing room after

work in the composing room had ceased, such that the Employer was permitted to assign Mr.

Sine to perform work in those other departments.  The Employer was not obligated to contribute

to the Plan on behalf of any employee who performed work outside of the composing room

except for those employees subject to the LJG who were assigned outside of the composing

room.

The Union never sought to represent employees outside of the composing room, and the

Plan never sought contributions on behalf of any employee other than those who worked in the

composing room or who were protected by the LJG and named in connection therewith.  It was
only after work in the composing room had ceased that the Employer assigned bargaining unit
employees to work in other departments consistent with the Parties' CBA.  The Employer does
not dispute that it had an obligation to contribute to the Plan on behalf of the employees covered
by the LJG who had previously been performing work in the composing room.  After the closure
of the composing room, the Employer's obligation to contribute was defined not by work
performed but on the basis of the individual employees subject to the LJG.  Furthermore, the
CBA – by its express terms – clearly prohibits the accretion of other departments or of the work
performed in those departments into the bargaining unit.  The Parties explicitly agreed, at Article
V, Section 4(g) of the CBA, that "[t]he Union shall not gain jurisdiction in other departments of
the Employer solely as a result of the operation of Sections (3) and (4) hereof nor shall any
transfers herein be deemed to cause an accretion to the collective bargaining unit."  Section 4(g)
anticipates precisely the argument that the Plan attempts to make here.  It expresses the Parties'
clear intent that the assignment of employees protected by the LJG to departments outside of the
composing room after composing room work has ceased will not expand the jurisdiction of the
Union.  Notably, the Plan makes no attempt to address Section 4(g) in its briefing.

  The Arbitrator should interpret Section 4(g) according to its plain meaning and should
reject the Plan's assertion of the Union's expanded jurisdiction.  The Plan's argument would
render this non-accretion language meaningless.  Furthermore, the question of accretion involves
the application of statutory policy and standards, which is a matter typically viewed as within the
province of the National Labor Relations Board and not within the authority of an arbitrator.
*See, e.g., Penske Truck Leasing Co., LP*, 371 NLRB No. 113, 1 (National Labor Relations Board
July 12, 2022) ("[T]he issue presented by the petition here is accretion, a statutory question for
the Board alone to decide, based on the Board's well-established standard.").

  Even if, however, the CBA were ambiguous – which it is not – as to whether work in
other departments was work for which the Employer was obligated to contribute to the Plan that
ambiguity would be resolved by evidence of the course of the Parties' dealing.  If work in other
departments was truly work for which contributions were required, one would expect the Plan to
have demanded contributions from the Employer on behalf of the other non-bargaining unit
employees working in those departments.  The Plan, however, has never made such a demand
before now.  The absence of any such demands reflects highly probative and compelling

evidence of the Parties' understanding of the obligation to contribute created by the CBA, which clearly did not extend to non-bargaining unit employees in departments outside of the composing room.

For all of these reasons, the Employer is entitled to a finding on summary judgment that it has not partially withdrawn from the Plan within the meaning of ERISA § 4205(b)(2)(A)(i).

## **CONTENTIONS OF THE PLAN**

Because the Employer experienced a partial withdrawal from the Plan in the plan year ending on December 31, 2022, the Plan is entitled to summary judgment here. Specifically, the Employer experienced a partial withdrawal from the Plan because it ceased to have an obligation to contribute to the Plan under its CBA covering its last bargaining unit employee at the Newspaper, but continued to have an obligation to contribute the Plan under its labor agreements covering its employees at other newspapers wholly owned by the Employer, and because it continued to assign employees employed at Cumberland to perform work within the jurisdiction of the CBA of the same type for which contributions were previously required to be made to the Plan.

Summary judgment is appropriate here because there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In this withdrawal liability arbitration proceeding, the Plan's factual determinations that support a withdrawal liability determination are presumed to be correct. *See* ERISA § 4221(a)(3)(A). In order to rebut that presumption, the Employer must prove by a preponderance of the evidence that the factual determinations made by the plan sponsor in issuing a withdrawal liability assessment are unreasonable or clearly erroneous. *See Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 622 (1993) ("'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' A showing of 'unreasonableness' would require even greater certainty of error on the part of a reviewing body." (internal citations omitted.)). Here, the Employer cannot overcome this presumption of correctness.

On this record, the Plan properly determined that the Employer triggered a partial withdrawal within the meaning of ERISA § 4205(b)(2)(A)(i) during the plan year ending

December 31, 2022.  The Arbitrator should apply the plain language of ERISA in determining whether the elements of a partial withdrawal were met here.  *See*, *e.g.*, *Nestle Holdings, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 342 F.3d 801, 804 (7th Cir. 2003) ("The basic rule in statutory interpretation is that plain statutory language governs." (internal citation omitted)).  All of the elements of a partial withdrawal for purposes of ERISA § 4205(b)(2)(A)(i) are met here.  Specifically, an employer experiences a partial withdrawal from a multiemployer pension plan in a plan year when that employer:

     a) permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan; but

     (b) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location or to an entity or entities owned or controlled by the employer.

ERISA § 4205(b)(2)(A)(i).

     If all of these elements are satisfied, then – as a matter of law – the Employer has experienced a partial withdrawal from the Plan.

     There is no question that, upon Mr. Sine's retirement in November 2022, Cumberland ceased to have an obligation to contribute to the Plan under the CBA.  This is supported by the factual stipulations of the Parties.  The Employer continued to have an obligation to contribute to the Plan under collective bargaining agreements that covered other employers within the CNHI controlled group.  This is also consistent with the factual stipulations of the Parties here.

     Furthermore, the uncontested factual record reflects that, after Mr. Sine retired from the Newspaper, Cumberland continued to perform work in the jurisdiction of the CBA of the same type for which contributions to the Plan had previously been required.  Specifically, Article V of the CBA established the Union's jurisdiction.  Sections 1 through 3 of Article V specify that the Union's traditional composing room jurisdiction had become non-exclusive and provided the Newspaper with flexibility to implement technological advancements in its production departments.  Section 4, however, makes clear that the jurisdiction of the Union under the CBA included work performed outside of the composing room, with "illustrative" examples of work in advertising customer service, work in the Customer Service Department, work otherwise assigned to computer technicians/operators, work involving pagination functions, work involving

data entry, and work involving layout.  Here, the stipulated factual record reflects that Mr. Sine was, at the time of his retirement, primarily assigned to perform data entry on advertising material.  Data entry work was expressly identified as one of the functions within the jurisdiction of the CBA as set forth in the illustrative examples contained in Section 4 of Article V.  The record reflects that Mr. Sine was also directed to use Adobe InDesign computer software and to save camera-ready files received from advertisers into a computer system for the graphics department to lay out.  These functions involve advertising customer service, computer operation, and layout – which also fall within the scope of the illustrative examples contained in Section 4 – and which should be considered within the jurisdiction of the Union as defined under the CBA.  Moreover, the Employer admitted that other employees at Cumberland performed – after Mr. Sine's retirement – the same type of data entry on advertising material that Mr. Sine had performed, and that the work performed by these employees did not create an obligation by the Employer to contribute to the Plan.  Even after Mr. Sine's retirement, the Newspaper continued to assign employees to perform the functions that had had been performed by Mr. Sine, such that Cumberland continued to perform work in the jurisdiction of the CBA of the same type for which contributions to the Plan had been previously required.

Therefore, all of the elements of a partial withdrawal pursuant to ERISA § 4205(b)(2)(A)(i) have been met here.  In May 2022, the Plan's Board of Trustees correctly determined that the Employer had experienced a partial withdrawal from the Plan.  Under ERISA § 4221(a)(3)(A), the Trustees' determination is presumed correct unless the Employer is able to demonstrate by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.  Following receipt of the Employer's request for review, the Trustees convened and considered all of the facts that had been provided to the Plan in connection with the assessment against the Employer, including the relevant provisions of the CBA and other information provided by the Employer regarding the work performed formed by Mr. Sine and by other employees following Mr. Sine's retirement.  Thereafter, the Trustees made a factual determination that the Newspaper had continued to perform work within the jurisdiction of the CBA of the same type for which the Newspaper had been required to make contributions to the Plan before Mr. Sine's retirement.  That determination is entitled to deference, and the Employer cannot on this record demonstrate that the determination was unreasonable or clearly erroneous.  Furthermore, PBGC Opinion Letter 86-21 supports the Plan's determination here.  That Opinion

Letter addressed a question of whether the performance of certain duties in one location as opposed to another – i.e., packing harvested crop in the field rather than in a packing shed – represented the same "type" of work for purposes of determining whether a partial withdrawal had occurred. In Opinion Letter 86-21, the PBGC OGC noted that this factual question is one that is to be initially resolved by the plan sponsor, with disputes between the plan sponsor and an employer to be resolved through arbitration or through subsequent litigation. Consistent with that Opinion Letter, the Trustees' factual conclusion here represents a reasonable determination that the Employer triggered a partial withdrawal under ERISA § 4205(b)(2)(A)(i), and the Arbitrator should defer to that determination in this case.

The Arbitrator should reject any argument by the Employer that it did not experience a partial withdrawal here based on an assertion that Cumberland had ceased to perform work in the composing room years earlier and therefore no longer performed work in the jurisdiction of the CBA after Mr. Sine's retirement. That argument ignores the express provisions of Article V, Section 4 of the CBA which specifically identified work outside of the composing room within the jurisdiction of the Union which was to be performed by bargaining unit employees and for which the Employer was therefore obligated to make contributions to the Plan. The Employer's argument would essentially assert that a partial withdrawal under ERISA § 4205(b)(2)(A)(i) could only occur where the Newspaper assigned employees to continue to perform now-obsolete work functions that were performed in the composing room. This would be nonsensical.

The Employer is wrong when it asserts that the only work for which contributions were required pursuant to the terms of the CBA was work in the composing room. Under the CBA, Cumberland was obligated to make contributions to the Plan for various types of work performed inside and outside of the composing room. The obligation to contribute was not limited to the composing room; rather it extended to an obligation to contribute for each employee covered by the CBA that is within the jurisdiction of the Union. In fact, Article V, Section 4(a) and (b) explicitly note that employees who are assigned to perform work outside of the composing room shall remain covered by the CBA. Put another way, the obligation to contribute did not stop at the composing room door – rather, it extended to bargaining unit employees assigned by the Newspaper to work outside of the composing room as well. Here, Mr. Goebel (who retired on December 31, 2019) and Mr. Sine performed various functions outside of the composing room for which the Employer was obligated to make contributions to the Plan. After both had retired,

Cumberland continued to assign employees to perform work of the type that Mr. Goebel and Mr. Sine had performed outside of the composing room but within the jurisdiction of the CBA, albeit without an obligation to contribute to the Plan.  In other words, the Newspaper continued to perform work of the type for which contributions were previously required when Mr. Goebel and Mr. Mr. Sine had performed that work.

    The Arbitrator should reject the Employer's assertion that the determinations made by the Plan's Trustees in this case were determinations of law rather than determinations of fact that are entitled to a presumption of correctness.  The relevant determination made by the Trustees here relates to the factual matter that, after Mr. Sine's retirement in November 2022, the Newspaper continued to perform the type of work described within Article V of the CBA as within the jurisdiction of the Union and for which the Newspaper had been required to make contributions to the Plan before Mr. Sine's retirement.

    The Arbitrator should also reject the Employer's misstatements of the relevant statutory language.  The relevant question here is not whether it must be shown that there was a continuation of exactly the same work for which contributions were previously required under the terms of the CBA after the obligation ceased.  Rather, the plain language of the statute provides, in relevant part, that the inquiry is as to whether the Employer continues to perform work in the jurisdiction of the CBA of the type for which contributions were previously required.  The phrase "of the type" connotes a more generalized view of the kinds of continued work that may trigger a partial withdrawal under ERISA § 4205(b)(2)(A)(i).  If Congress had intended for the continued work to have to be identical to the work that had been done previously, Congress would have made that requirement clear.  It did not.  Instead, the determination as to whether a partial withdrawal has occurred is based upon the Employer's continuation of the "type of work" that had previously required contributions to the Plan.  There is no statutory requirement that the work that the Newspaper continued to perform be the same work that Mr. Sine performed prior to his retirement.  Rather, it merely must be "of the type" for which contributions were previously required.

    The holding in *Caesars Entm't Corp. v. IUOE Local 68 Pension Fund*, No. 2:17-cv-2450-KM-MAH, 2018 U.S. Dist. LEXIS 100734 (D.N.J. June 14, 2018), supports the Plan's determination in this case rather than the Employer's position.  In that case, Caesars did not continue to perform work at the closed casino of the type for which contributions were

previously required.  By contrast, here, after Mr. Sine's retirement in November 2022, the
Newspaper continued to perform work of the type that Mr. Sine had performed pursuant to
Article V, Section 4 of the CBA, but when that work was performed after November 2022, the
Employer was no longer required to make contributions to the Plan.  The ultimate holding in
*Caesars* – i.e., that the phrase "work of the type for which contributions were previously
required" means "work of the type for which contributions are no longer required" – fully
supports the partial withdrawal liability determination by the Plan here.

  The Arbitrator should note that the decisions in *Laborers' Pension Fund v. W.R. Weis
Co.*, 879 F.3d 760 (7th Cir. 2018), and in *Whiting-Turner Constr. Co. and Laborers Dist.
Council Pension and Disability Tr. Fund No. 2*, AAA Case No. 01-18-003-5360 (Arbitrator Ira
F. Jaffe, Esq.) (July 10, 2023), each involve unique facts and the decisions are without general
application to determining whether a partial withdrawal has been triggered under ERISA §
4205(b)(2)(A)(i).  The Arbitrator should also note that the Award in *Whiting-Turner* is currently
the subject of litigation; and that the decision in *W.R. Weis Co.* predated the Third Circuit's
decision in *Caesars* which construed the statutory phrase "continues to perform work in the
jurisdiction of the CBA of the type for which contributions were previously required" in the
context of the building and construction industry exemption.  If anything, that phrase must be
interpreted broadly in order to capture work for which contributions have been required of
anyone – regardless of who is doing the work and who has the contribution obligation.  *See, e.g.*,
*Structure Tone, Inc. v. N.Y.C. Dist. Council of Carpenters Pension Fund*, No. 17-cv-2917 (RJS),
2018 U.S. Dist. LEXIS 55919 (S.D.N.Y. Mar. 30, 2018).  If applied to ERISA §
4205(b)(2)(A)(i) here, as informed by the holding in *Caesars*, the decision in *Structure Tone,
Inc.* would similarly militate in favor of an appropriately broad interpretation of ERISA §
4205(b)(2)(A)(i) that would support the Plan's determination of partial withdrawal liability
against the Employer here.

  The Arbitrator should note that the Plan's position in this case does not include an
assertion that the jurisdiction of the Union had expanded when bargaining unit employees were
assigned to perform work outside of the composing room.  Rather, Article V, Section 4 of the
CBA specifically contemplated that bargaining unit employees would be assigned to perform
work outside of the composing room but would nevertheless be covered by the CBA such that
the Employer would be obligated to make contributions on their behalf – i.e., the Newspaper and

the Union explicitly agreed to the expansion of the Union's work jurisdiction. The Newspaper continued to perform work after November 2022 that Mr. Sine had performed prior to his retirement. Prior to November 2022, the Employer had made contributions to the Plan on behalf of that work, but no longer did so after November 2022 despite the work remaining the same. That scenario is sufficient to establish, under the plain meaning of ERISA § 4205(b)(2)(A)(i), that a partial withdrawal from the Plan occurred. Any faithful reading of the statutory language leads to the inescapable conclusion that the Employer experienced a partial withdrawal from the Plan in the plan year ending December 31, 2022.

The Arbitrator should also reject any argument by the Employer that it continued to make contributions to the Plan for Mr. Sine and other bargaining unit employees only because it was obligated to do so under the LJG that the Union had negotiated for the affected employees. That fact, even if true, does not change the fact that after Mr. Sine retired, Cumberland continued to assign other employees to perform the same type of work that Mr. Sine had performed which was within the jurisdiction of the CBA, and that Cumberland no longer had an obligation to make contributions to the Plan when that work was performed by those other employees.

For all of these reasons, the Plan is entitled to summary judgment and a finding that, in the plan year ending December 31, 2022, the Employer experienced a partial withdrawal from the Plan within the meaning of ERISA § 4205(b)(2)(A)(i).

## DISCUSSION AND OPINION

After careful consideration of the entire record, I find that the Employer has established by a preponderance of the evidence that the Plan's determination that the Employer experienced a partial withdrawal from the Plan pursuant to ERISA § 4205(b)(2)(A)(i) in the plan year ending December 31, 2022 was clearly erroneous. The Employer's Motion for Summary Judgment is, therefore, granted, and the Plan's Motion for Summary Judgment is denied. A summary of the principal reasons for this holding follows.

As ERISA § 4205(b)(2)(A)(i) sets forth, an employer experiences a partial withdrawal when the "employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers

such work to another location." There is no dispute that the Employer ceased to have an obligation to contribute to the Plan under the Newspaper's CBA with the Union following Mr. Sine's retirement in November 2022. Similarly, there is no dispute that the Employer continued to have an obligation to contribute to the Plan under other collective bargaining agreements following the cessation of its obligation to contribute under the CBA.

The factual record in this case establishes that the work for which contributions were required under the CBA had historically been composing room work but that, in recognition of the fact that such work would be phased out or supplemented by "new technology, new equipment or new processes," the Newspaper and the Union subsequently agreed to require contributions for various other types of work that were not composing room work, but only when that work was performed by the individual employees included on the LJG list. These identified employees were the only remaining bargaining unit employees at the Newspaper. By the time that the Newspaper and the Union entered into the CBA in 2018, there were only two bargaining unit employees remaining on the LJG list – Mr. Goebel and Mr. Sine.

The purpose of MPPAA's provisions concerning partial withdrawal liability – including as set forth at ERISA § 4205(b)(2)(A)(i) – is to protect the contribution base of a fund from diminution in situations where the hours of work that led to contributions before the alleged partial withdrawal continue to be performed without contributions being made or being required to be made. Here, the work of the type for which contributions were required was – by the time that the Parties entered into the CBA – only that work either performed by composing room employees or by the specified employees covered by the LJG.

After November 2022, there was no work performed by composing room employees or by employees covered by the LJG. Put another way, the continued performance of work – after November 2022 – that had previously been performed by Mr. Sine was work performed by employees who were not subject to the LJG and were not composing room employees. As a result, no contributions were required to be made for that work. The fact that the Plan never sought contributions from the Employer for any of those other employees performing the same duties as those performed outside of the composing room by Mr. Sine or other employees covered by the LJG – including duties such as data entry, saving e-mailed files from advertisers, manual filing of tear sheets or saving camera ready files received from advertisers into the system for the Graphics Department to lay out – further indicates that the Plan understood that

the Employer's obligation to contribute was limited to those remaining bargaining unit employees identified as subject to the LJG. The continued performance of the work previously performed by Mr. Sine did not, therefore, constitute work of the type within the jurisdiction of the CBA for which contributions were previously required.

Nor do the duties and assignments listed in Article V, Section 4(a) of the CBA provide a basis to find that the Newspaper and the Union had agreed to expand the Union's work jurisdiction. These – "Advertising Customer Service"; "Customer Service Department"; "Computer Technicians/Operators, including computer-to-plate equipment"; "Pagination Functions; "Data Entry"; and "Layout" – are identified in Article V as nothing more than "illustrative" examples of assignments that the Newspaper and the Union agreed were consistent with the types of assignments – for purposes of Article V, Section 4(a) – that were "work requiring compatible skill, aptitude or ability similar to that traditionally performed by bargaining unit employees." Nor did the assignment of Mr. Sine or other bargaining unit employees to perform work of that type or in those departments provide a basis to support a finding of an expansion of the Union's jurisdiction. At Section 4(g) of Article V, the Newspaper and the Union specified that "[t]he Union shall not gain jurisdiction in other departments of the [Newspaper] solely as a result of the operation of Sections (3) and (4) hereof nor shall any transfers herein be deemed to cause an accretion to the collective bargaining unit." The evidentiary record, therefore, provides no support for the Plan's assertion that the assignment of Mr. Goebel and Mr. Sine to perform duties outside of the composing room had expanded the jurisdiction of the Union. Even assuming, without deciding, whether the matter of accretion was properly presented for decision here, there was also no basis shown upon which to find that additional duties accreted to the bargaining unit represented by the Union. The Plan's claim that the Union's jurisdiction had expanded beyond the composing room work and the specified employees covered by the LJG is, therefore, rejected.

For all of these reasons, I find that after Mr. Sine's retirement, the Employer no longer performed work in the jurisdiction of the collective bargaining agreement between the Employer and the Union of the type for which contributions were previously required. As a result, the conditions for a partial withdrawal pursuant to ERISA § 4205(b)(2)(A)(i) were not met and the Employer did not experience a partial withdrawal from the Plan in the plan year ending December 31, 2022. I am therefore persuaded that, regardless of whether the Plan's

determination is considered to be a factual determination or a legal determination, the Employer has demonstrated by a preponderance of the evidence that the Plan's determination that the Employer experienced a partial withdrawal pursuant to ERISA § 4205(b)(2)(A)(i) following Mr. Sine's retirement was clearly erroneous.  The Employer's Motion for Summary Judgment is, therefore, granted, and the Plan's Motion for Summary Judgment is denied.

In light of this holding, it is unnecessary to address the Employer's remaining arguments.

## **AWARD**

For the reasons set forth in the foregoing Opinion, the Employer's Motion for Summary Judgment is granted, and the Plan's Motion for Summary Judgment is denied.  The Employer has demonstrated by a preponderance of the evidence that the Plan's determination that the Employer experienced a partial withdrawal pursuant to ERISA § 4205(b)(2)(A)(i) following Mr. Sine's retirement was clearly erroneous.

Jurisdiction is retained to address any remaining disputes, including those related to remedy, that the Parties are unable to resolve on remand.

June 2, 2025

Keith D. Greenberg, Esq.
Impartial Arbitrator